UNITED STATES DISTRICT COURT
IN AND FOR THE WESTERN DISTRICT OF LOUISIANA
Shreveport Division

GLYNN DALE SISTRUNK and
LAWANA ANN SISTRUNK,

                              Plaintiffs,

Versus                                          Civil Action No.

GREGORY LAMAR HADDOX and LINCOLN
NATIONAL CORPORATION D/B/A
LINCOLN FINANCIAL GROUP D/B/A
LINCOLN FINANCIAL ADVISORS                      JUDGE
CORPORATION, A MEMBER OF
LINCOLN FINANCIAL GROUP,                        **JURY DEMANDED**
                              Defendants.

## ORIGINAL COMPLAINT AND REQUEST FOR JURY TRIAL

NOW INTO COURT, through undersigned counsel, come **GLYNN DALE SISTRUNK and LAWANA ANN SISTRUNK**, Plaintiffs in the above entitled and captioned matter, who respectfully pray for Judgment of this Honorable Court against defendants, **GREGORY LAMAR HADDOX and LINCOLN NATIONAL CORPORATION D/B/A LINCOLN FINANCIAL GROUP D/B/A LINCOLN FINANCIAL ADVISORS CORPORATION**, jointly, severally and in solido, as set forth in the following complaint:

### PLAINTIFFS

1.

Plaintiffs, GLYNN DALE SISTRUNK and LAWANA ANN SISTRUNK, are major domiciliaries of Texas, and are husband and wife in community.  Plaintiffs may be referred to in the singular or plural, as "plaintiff" or "plaintiffs."

## DEFENDANTS

2.

Made Defendants herein are:

[a]   GREGORY LAMAR HADDOX, who may also hereinafter be referred to as

"HADDOX," is believed to be a major domiciliary of Ruston, Louisiana, and was a

professed insurance agent, securities broker and dealer and investment advisor, doing

business in the State of Louisiana.  HADDOX is/was an officer, director, employee,

representative and agent of co-defendants, LINCOLN NATIONAL CORPORATION

D/B/A LINCOLN FINANCIAL GROUP D/B/A LINCOLN FINANCIAL ADVISORS

CORPORATION; and

[b]   LINCOLN NATIONAL CORPORATION D/B/A LINCOLN FINANCIAL GROUP

D/B/A LINCOLN FINANCIAL ADVISORS CORPORATION, which may also

hereinafter be referred to as "LINCOLN," believed to be a foreign corporation, not

authorized to do but doing business in the State of Louisiana, organized in the State of

Indiana, with its principal place of business located in Radner, Pennsylvania, and also

operating as a licensed securities broker and dealer, as well as a licensed investment

advisor.

## JURISDICTION OF THE COURT and VENUE

3.

Plaintiffs respectfully assert that this Honorable Court has jurisdiction in this case arises

under federal law and the matter in controversy exceeds $75,000.00, exclusive of costs and

interest and the parties to these proceedings are citizens of different states thereby establishing

the requisite diversity of citizenship. 28 U.S.C. 1331, 1332.  Venue is proper in this District as the Defendants reside in this judicial district. 28 U.S.C. 1391[b],[c].

## REQUEST FOR TRIAL BY JURY

4.

Plaintiffs request a trial by jury.

## REQUEST FOR EXEMPLARY/PUNITIVE DAMAGES

5.

Plaintiffs respectfully request that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual, statutory, or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of common law and Texas state laws.

## REQUEST FOR COSTS OF LITIGATION AND ATTORNEYS' FEES

6.

Plaintiffs respectfully request that this Honorable Court award plaintiffs their litigation expenses and other costs of litigation and reasonable attorneys' fees incurred in this litigation.

## GENERAL FACTUAL BASIS

7.

Plaintiffs are consumers, and unsophisticated, unqualified investors.

8.

Defendant HADDOX told plaintiffs that he was a securities and investment broker and advisor and that Defendant HADDOX could assist plaintiffs in procuring lucrative annuities in companies for whom he was a registered and authorized agent, such as ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA and JACKSON NATIONAL LIFE INSURANCE COMPANY.

9.

Defendant HADDOX told plaintiffs that he and his insurance/investment firm, Defendant LINCOLN, were associated and affiliated with annuity companies for whom he and his firm were registered and authorized agents, such as ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and JACKSON NATIONAL LIFE INSURANCE COMPANY.

10.

Defendants advertised that they represented consumers like plaintiffs by providing investment advice, portfolio management and related services in buying and selling annuities, which are securities under state and federal laws.

11.

Defendants were continually advising plaintiffs about alleged annuity investments to permit plaintiffs to retire and plaintiffs' stated objectives were low risk, conservative annuities.

12.

Plaintiffs specified the need for conservative investment devices that would guarantee returns without risk of losing the funds invested.

13.

Defendants made clear to plaintiffs that the defendants were acting as plaintiffs' investment advisors, brokers and fiduciaries.

14.

Defendants advised plaintiffs that the defendants were acting in plaintiffs' best interests.

15.

Plaintiffs had maintained investments with USAA prior to 2005 when defendants convinced plaintiffs, due to Mr. SISTRUNK's impending retirement from Louisiana Tech University, to liquidate most of plaintiffs' USAA investments and allow the creation of an annuity account with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, in or about February, 2005.

16.

In or about May, 2005, defendants created an ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA account for plaintiffs and transferred approximately $83,759, into that PremierDex 5 annuity and allocated 100% to the S&P 500.  Defendants had liquidated some of plaintiffs' USAA holdings to fund this annuity.

17.

Defendants did not show plaintiffs adequate or pertinent information about the commissions charged, fees, bonuses, the expected return or surrender charges.

18.

Unbeknownst to plaintiffs at the time, on or about October 31, 2005, defendants transferred another approximately $40,000 from plaintiffs' holdings, which defendants liquidated from plaintiffs' USAA holdings, to ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA.

19.

Unbeknownst to plaintiffs initially, on or about July 10, 2006, defendants created yet another ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA account for

plaintiffs, under [truncated] account #8240, and transferred more of plaintiffs' holdings, which defendants liquidated, into this IRA-Roth annuity.  Defendants had liquidated some more of plaintiffs' USAA holdings to fund this annuity.

20.

Once again, defendants did not show plaintiffs adequate or pertinent information about the commissions charged, bonuses, fees, the expected return or surrender charges.

21.

Unbeknownst to plaintiffs, as of December 31, 2006, defendants had liquidated a sizable portion of plaintiffs' USAA holdings and created multiple annuity accounts with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA.

22.

On or about December 31, 2006, defendants issued a statement to plaintiffs showing [truncated] account #8240 bearing approximately $219,700, [truncated] account #7994 bearing approximately $8,357, and  [truncated] account #7982 bearing approximately $52,842, each with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA.  Defendants had performed a number of transactions without notifying plaintiffs at the time and assessed large commissions, fees, etc., but defendants did not disclose those charges to plaintiffs.

23.

On or about May 30, 2007, defendants sent two checks, one to each plaintiff, representing cash surrender values from two annuities held by plaintiffs.  The first check in the sum of approximately $30,351 to Mr. SISTRUNK from [truncated] account #9255, and the second check in the sum of approximately $30,366 to Mrs. SISTRUNK from [truncated] account #9256.

24.

Unbeknownst to plaintiffs, on or about June 4, 2007, defendants created another

ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA account for plaintiffs,

under [truncated] account #9074, and transferred more of plaintiffs' holdings, which defendants

liquidated, into this annuity, including funds from the aforementioned cash surrendered annuities

from [truncated] account #9255, and from [truncated] account #9256, which resulted in sizable

commission charges and surrender fees deducted and assessed.

25.

Once again, defendants did not show plaintiffs adequate or pertinent information about

the commissions charged, bonuses, fees, the expected return or surrender charges.

26.

On or about June 4, 2007, defendants caused National Financial Services, LLC, to issue a

check to plaintiffs from yet another liquidated account of plaintiffs where defendants liquidated

the account and again assessed surrender fees and charges, then placed the greatly reduced funds

into this latest annuity [truncated] account #9074, with ALLIANZ LIFE INSURANCE

COMPANY OF NORTH AMERICA.

27.

It is clear now that plaintiffs, as of a date close to suit filing, obtained a more complete set

of records, that defendants were systematically churning and moving plaintiffs' monies, at great

expense, commissions, bonuses, fees and surrender charges, into annuities with ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA.  Plaintiffs were not aware at the time of

those transactions.

28.

Unbeknownst to plaintiffs, on or about July 10, 2007, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a one year [annual] statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, showing a beginning value as of July, 2006, at approximately $219,700, an ending value as of July, 2007, at approximately $261,147, almost exclusively due to defendants' acts of liquidating and adding new monies, and a period ending cash surrender value of approximately $189,943.

29.

As of December 31, 2007, plaintiffs' USAA total portfolio listed a value of approximately $24,980, compared to December, 2006, when the total portfolio was reported as bearing approximately $89,228, compared to April, 2006, when the total portfolio was reported as bearing approximately $198,942.

30.

As of December 31, 2008, plaintiffs' USAA total portfolio listed a value of approximately $19,408, compared to the December 31, 2007, value of approximately $24,980, compared to December, 2006, when the total portfolio was reported as bearing approximately $89,228, compared to April, 2006, when the total portfolio was reported as bearing approximately $198,942.

31.

As of December 31, 2009, plaintiffs' USAA total portfolio listed a value of approximately $14,091.  Hence, the USAA account had been substantially bled down by defendants and was diminishing.

32.

Unbeknownst to plaintiffs, on or about March 23, 2010, defendants communicated with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and defendants obtained a loan in the principal sum of $50,000 [a check of $49,533.72 was sent to defendants after fees charged and received by defendants as well], assessed to plaintiffs and charged against plaintiffs' annuities.

33.

Plaintiffs did not request or know of or receive or benefit from this fraudulent loan.

34.

The subject loan was made under annuity [truncated] account #9074, with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA.

35.

Upon information and belief, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA provided the subject loan proceeds in the form of a check payable to plaintiffs but sent to defendants.  Plaintiffs were not aware.

36.

Also unbeknownst to plaintiffs, defendants had submitted papers to ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA causing all statements and mail regarding plaintiffs' annuities [and all other issues] to be directed to defendants' address and, in particular HADDOX's home address.

37.

Plaintiffs did not authorize defendants to list HADDOX's home address as that of

plaintiffs nor did plaintiffs know that defendants were receiving information which ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA was required to report to plaintiffs.

38.

Unbeknownst to plaintiffs, defendants had created an account in plaintiffs' names and identities with JACKSON NATIONAL LIFE INSURANCE COMPANY and on or about May 12, 2011, there was a forged withdrawal and surrender form purporting to direct JACKSON NATIONAL LIFE INSURANCE COMPANY to liquidate an annuity bearing [truncated] account #5582.  Plaintiffs were not aware.

39.

Plaintiffs did not request or know of or receive or benefit from these fraudulent transactions.

40.

On or about October 17, 2011, defendants created another ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA account for plaintiffs, under [truncated] account #3526, and transferred more of plaintiffs' holdings, which defendants liquidated, into this annuity, which resulted in sizable commission charges and surrender fees deducted and assessed.  Plaintiffs were not aware.

41.

As of December 31, 2011, plaintiffs' USAA total portfolio listed a value of approximately $16,005.

42.

In or about March, 2012, defendants created a new JACKSON NATIONAL LIFE

INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963, and transferred more of plaintiffs' holdings from ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, in [truncated] account #7982, which defendants liquidated, into this JACKSON NATIONAL LIFE INSURANCE COMPANY annuity, which resulted in sizable commission charges and surrender fees deducted and assessed.  Plaintiffs were not aware.

43.

This new JACKSON NATIONAL LIFE INSURANCE COMPANY Ascender Plus Select Fixed Index Annuity account that defendants created on or about March 16, 2012, in plaintiffs' identity, under [truncated] account #8894, began with a check in the sum of approximately $3,972 that ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued to plaintiffs and appears to bear a forged endorsement and made payable to JACKSON NATIONAL LIFE INSURANCE COMPANY. Plaintiffs were not aware.

44.

JACKSON NATIONAL LIFE INSURANCE COMPANY received the check on or about March 22, 2012.

45.

Unbeknownst to plaintiffs until recently, HADDOX's license to sell variable contracts in Louisiana was cancelled by the Department of Insurance for the State of Louisiana on or about March 31, 2012.  HADDOX nor his co-defendant ever told plaintiffs of HADDOX's license cancellation.

46.

Unbeknownst to plaintiffs, on March 16, 2012, ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's
home address at defendants' directions, with notification of an alleged request to take a
distribution from [truncated] account #8894 but never mentioned that HADDOX's license was
under scrutiny and being cancelled.

47.

Plaintiffs contacted defendants and HADDOX advised plaintiffs that it was necessary for
plaintiffs' monies to be moved from ALLIANZ LIFE INSURANCE COMPANY OF NORTH
AMERICA to JACKSON NATIONAL LIFE INSURANCE COMPANY but never uttered a
word about his impending license cancellation days later.

48.

Unbeknownst to plaintiffs, on or about July 23, 2012, defendants created another
JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity,
under [truncated] account #0992, and transferred more of plaintiffs' holdings, approximately
$110,000, from ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, in
[truncated] account #7982, which defendants liquidated, into this JACKSON NATIONAL LIFE
INSURANCE COMPANY annuity, which resulted in sizable commission charges and surrender
fees deducted and assessed. Plaintiffs were not aware.

49.

The check for approximately $110,000, issued by ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA and made payable to plaintiffs appears to again contain

forged endorsements and yet was purportedly endorsed and made payable to JACKSON

NATIONAL LIFE INSURANCE COMPANY.  Plaintiffs were not aware.

50.

Further, unbeknownst to plaintiffs, defendants completed documentation which

defendants submitted directly to JACKSON NATIONAL LIFE INSURANCE COMPANY,

stating that plaintiffs' address was in Ruston, Louisiana, at an address which is actually

HADDOX's home address.

51.

The same documentation contained defendants' name and actual business address.

52.

Nowhere did defendants advise JACKSON NATIONAL LIFE INSURANCE

COMPANY of plaintiffs' true address.

53.

Unbeknownst to plaintiffs, on or about October 11, 2012, defendants created yet another

JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity,

under [truncated] account #8963, and transferred more of plaintiffs' holdings, approximately

$94,336, from ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, in

[truncated] account #8240, which defendants liquidated, into this JACKSON NATIONAL LIFE

INSURANCE COMPANY annuity, which resulted in sizable commission charges, fees, and

surrender fees deducted and assessed.

54.

Unbeknownst to plaintiffs, the check for approximately $94,336, issued by ALLIANZ

LIFE INSURANCE COMPANY OF NORTH AMERICA, which was mis-directed to

HADDOX's home address at defendants' directions, and made payable to plaintiffs appears to

again contain forged endorsements and yet was again purportedly endorsed and made payable to

JACKSON NATIONAL LIFE INSURANCE COMPANY.

55.

Further, unbeknownst to plaintiffs, defendants completed documentation which

defendants submitted directly to JACKSON NATIONAL LIFE INSURANCE COMPANY,

stating that plaintiffs' address was in Ruston, Louisiana, at an address which is actually

HADDOX's home address.

56.

The same documentation contained defendants' name and actual business address.

57.

Nowhere did defendants advise JACKSON NATIONAL LIFE INSURANCE

COMPANY of plaintiffs' true address.

58.

Unbeknownst to plaintiffs, on October 10, 2012, ALLIANZ LIFE INSURANCE

COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's

home address at defendants' directions, with notification of a request to cash surrender

[truncated] account #8240 but never mentioned that HADDOX's license was cancelled.

59.

Unbeknownst to plaintiffs, JACKSON NATIONAL LIFE INSURANCE COMPANY

issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at

defendants' directions, which stated that, as of December 11, 2012, the JACKSON NATIONAL

LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated]

account #8963 [issued back on March 22, 2012], had a total value of approximately $124,095,

almost exclusively from monies which defendants placed into the annuity account from

plaintiffs' holdings which defendants were systematically liquidating and moving around.

60.

Unbeknownst to plaintiffs until recently, JACKSON NATIONAL LIFE INSURANCE

COMPANY issued a Statement to plaintiffs, which was mis-directed to HADDOX's home

address at defendants' directions, which stated that, as of December 31, 2012, the JACKSON

NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under

[truncated] account #0992 [issued back on July, 2012], had a total value of approximately

$110,471, almost exclusively from monies which defendants placed into the annuity account

from plaintiffs' holdings which defendants were systematically liquidating and moving around.

61.

As of December 31, 2012, plaintiffs' USAA total portfolio listed a value of

approximately $15,889.

62.

Unbeknownst to plaintiffs until recently, JACKSON NATIONAL LIFE INSURANCE

COMPANY issued an annual Statement [for a period of March 22, 2012 to April 1, 2013] to

plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which

stated that, as of April 1, 2013, the JACKSON NATIONAL LIFE INSURANCE COMPANY

annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March,

2012], had a total value of approximately $124,539, almost exclusively from monies which defendants placed into the annuity account from plaintiffs' holdings which defendants were systematically liquidating and moving around, yet the annuity had a cash surrender value of approximately $112,708.

63.

On April 10, 2013, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs with a vague notification that HADDOX was no longer affiliated with ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA but ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA never mentioned that HADDOX's license was cancelled.

64.

Immediately upon receipt of the letter from ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, plaintiffs contacted defendants but defendants downplayed HADDOX's situation as a simple change of relationship as to ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA but defendants never mentioned that HADDOX's license was cancelled.

65.

Unbeknownst to plaintiffs until recently, on or about May 4, 2013, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of May 4, 2013, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #9074 [issued back on June, 2007], had a value of approximately $72,916 and an alleged loan balance [on the aforementioned March,

2010 fraudulent loan] due of approximately $62,985.

66.

Unbeknownst to plaintiffs until recently, on or about June 3, 2013, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued an annual [for time period June 4, 2012 to June 3, 2013] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of June 3, 2013, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #8894 had a value of approximately $15,335 and an alleged loan balance [on the aforementioned March, 2010 fraudulent loan] due of approximately $62,985.

67.

Unbeknownst to plaintiffs until recently, JACKSON NATIONAL LIFE INSURANCE COMPANY issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of August 2, 2013, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #0992 [issued back on July, 2012], had a total value of approximately $114,147, almost exclusively from monies which defendants placed into the annuity account from plaintiffs' holdings which defendants were systematically liquidating and moving around, yet the annuity had a cash surrender value of approximately $103,303.

68.

As of December 31, 2013, plaintiffs' USAA total portfolio listed a value of approximately $13,099.

69.

Plaintiffs inquired, multiple times, about the lack of information from defendants pertaining to their accounts and defendants claimed that the annuity issuers, such as ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, were lagging behind in issuing notices and statements.

70.

It was in or about early 2014 that plaintiffs' complaints of lack of information resulted in defendants committing further frauds by issuing falsified statements to plaintiffs where defendants would scan the mis-directed "real" statements from the annuity issuers and then defendants would alter information in the scanned document and print a new, falsified statement containing different information and defendants mailed those statements to plaintiffs so as to appease yet mislead plaintiffs.

71.

These acts were in furtherance of and to conceal the churning activities by defendants.

72.

Unbeknownst to plaintiffs until recently, on or about February 2, 2014, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of February 2, 2014, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #7982 had a value of approximately $59,997.

73.

Unbeknownst to plaintiffs until recently, on or about March 28, 2014, JACKSON NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of April 1, 2013 to March 28, 2014] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of March 28, 2014, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March, 2012], had a total value of approximately $126,096, with interest earned of approximately $1,557, and a cash surrender value of approximately $115,378.

74.

Unbeknownst to plaintiffs until recently, defendants took the real and mis-directed March 28, 2014, JACKSON NATIONAL LIFE INSURANCE COMPANY annual [for a period of April 1, 2013 to March 28, 2014] Statement, under [truncated] account #8963 [issued back on March, 2012], and defendants altered and created a new version to suggest that the annuity interest earned and total value and cash surrender values were larger than reality.

75.

Plaintiffs had no reason to know or suspect defendants' fraud.

76.

Unbeknownst to plaintiffs until recently, on or about May 4, 2014, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of May 4, 2014, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #9074 had a value of approximately

$171,684 and an alleged loan balance due of approximately $68,024.

77.

Upon information and belief, the alleged and fraudulent loan balance listed in association with the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account, in plaintiffs' identity, under [truncated] account #9074, may not be the same and aforementioned March, 2010 fraudulent loan, which was reportedly linked to the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #8894 as shown in the June 3, 2013 Statement, as alleged herein above.

78.

It is believed that defendants procured a second fraudulent loan in plaintiffs' identity and associated with plaintiffs' ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity accounts and the second such loan was tied to the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account, in plaintiffs' identity, under [truncated] account #9074.

79.

Unbeknownst to plaintiffs until recently, on or about May 24, 2014, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of May 24, 2014, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #3526 had a value of approximately $88,757, and a cash surrender value of approximately $57,866.

80.

Unbeknownst to plaintiffs until recently, on or about June 7, 2014, ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA issued an annual [for period of June 8, 2013

to June 7, 2014] Statement to plaintiffs, which was mis-directed to HADDOX's home address at

defendants' directions, which stated that, as of June 7, 2014, the ALLIANZ LIFE INSURANCE

COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated]

account #9747 had a value of approximately $22,394, and a cash surrender value of

approximately $36,712.

81.

Unbeknownst to plaintiffs until recently, on or about June 4, 2014, ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA issued an annual [for period of June 4, 2013

to June 4, 2014] Statement to plaintiffs, which was mis-directed to HADDOX's home address at

defendants' directions, which stated that, as of June 4, 2014, the ALLIANZ LIFE INSURANCE

COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated]

account #8894 had a value of approximately $16,901, and a cash surrender value of

approximately $31,033.

82.

In mid-year 2014 plaintiffs again expressed complaints of lack of information and, once

again, defendants committed further frauds by issuing falsified statements to plaintiffs where

defendants would scan the mis-directed "real" statements from the annuity issuers and then

defendants would alter information in the scanned document and print a new, falsified statement

containing different information and defendants mailed those statements to plaintiffs so as to

appease yet mislead plaintiffs.

83.

Unbeknownst to plaintiffs until recently, on or about August 1, 2014, JACKSON NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of August 1, 2013 to August 1, 2014] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of August 1, 2014, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #0992 [issued back on July, 2012], had a total value of approximately $114,146, with interest earned of $0.00, and a cash surrender value of approximately $104,444.

84.

Unbeknownst to plaintiffs until recently, defendants took the real and mis-directed August 1, 2014, JACKSON NATIONAL LIFE INSURANCE COMPANY annual [for a period of August 1, 2013 to August 1, 2014] Statement, under [truncated] account #0992 [issued back on July, 2012], and defendants altered and created a new version to suggest that the annuity interest earned and total value were larger than reality.

85.

Plaintiffs had no reason to know or suspect defendants' fraud.

86.

As of December 31, 2014, plaintiffs' USAA total portfolio listed a value of approximately $13.39.

87.

On or about January 6, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH

AMERICA wrote plaintiffs regarding plaintiffs' recent inquiry about a [fraudulent] loan that plaintiffs learned of and ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA claimed that the original loan was issued on March 23, 2010, with an alleged payoff and balance due of approximately $71,645.

88.

Plaintiffs contested the loan as inaccurate and asserted that the loan was not taken out by plaintiffs.

89.

ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA did not mention the second fraudulent loan tied to the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account, in plaintiffs' identity, under [truncated] account #9074.

90.

Unbeknownst to plaintiffs until recently when plaintiffs obtained a copy of file materials from defendants, that defendants, on or about January 30, 2015, accessed an internet-based site for ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and defendants accessed and printed an account ledger for what is believed to be the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9074, as alleged herein above, which reflected an alleged loan balance of approximately $71,994, with an account value of approximately $172,513, a cash surrender value of approximately $100,434, but also containing an indication that defendants had withdrawn approximately $30,000 in partial cash surrender from that annuity account.

91.

Plaintiffs did not request or know of or receive or benefit from the fraudulent approximately $30,000 in partial cash surrender.

92.

Unbeknownst to plaintiffs until recently, on or about February 3, 2015, defendants created an alleged withdrawal request to ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA concerning the annuity [truncated] account #8894.

93.

Unbeknownst to plaintiffs until recently, on or about February 4, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, regarding ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #8894 and indicated that a cash surrender request had been received by ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a check in the sum of approximately $31,500.

94.

Unbeknownst to plaintiffs until recently, on or about February 4, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, regarding ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #8934 and indicated that a cash surrender request had been received by ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and ALLIANZ LIFE INSURANCE COMPANY OF

NORTH AMERICA issued a check in the sum of approximately $31,516.

95.

Unbeknownst to plaintiffs until recently, on or about February 4, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, regarding ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9747 and indicated that a cash surrender request had been received by ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a check in the sum of approximately $37,280.

96.

Unbeknownst to plaintiffs until recently, on or about February 19, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, regarding ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #8894, and indicated that a cash surrender request had been received by ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA and ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA showed a cash surrender value of approximately $31,514.

97.

Unbeknownst to plaintiffs until recently, on or about February 20, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, regarding ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9747, in

association with companion annuity [truncated] policy #8894, and indicated that a cash surrender

request had been received by ALLIANZ LIFE INSURANCE COMPANY OF NORTH

AMERICA and ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a

check in the sum of approximately $37,315.

98.

Unbeknownst to plaintiffs until recently, on or about March 5, 2015, defendants created a

NATIONAL WESTERN LIFE INSURANCE COMPANY annuity account in plaintiffs' identity

and transferred more of plaintiffs' holdings, approximately in the transferred sums of

approximately $33,487, $33,455 and $160,657, which defendants liquidated, into this

NATIONAL WESTERN LIFE INSURANCE COMPANY annuity, which resulted in sizable

commission charges and surrender fees deducted and assessed.

99.

Unbeknownst to plaintiffs until recently, on or about March 27, 2015, JACKSON

NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of March 28, 2014

to March 27, 2015] Statement to plaintiffs, which was mis-directed to HADDOX's home address

at defendants' directions, which stated that, as of March 27, 2015, the JACKSON NATIONAL

LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated]

account #8963 [issued back on March, 2012], had a total value of approximately $128,266, and a

cash surrender value of approximately $118,000.

100.

On or about April 6, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH

AMERICA wrote plaintiffs regarding plaintiffs the fraudulent loan [that plaintiffs learned of and

contested] which is believed to be tied to the ALLIANZ LIFE INSURANCE COMPANY OF

NORTH AMERICA annuity [truncated] account #9074, as alleged herein above, and ALLIANZ

LIFE INSURANCE COMPANY OF NORTH AMERICA claimed that contract interest payment

of approximately $5,877 was due on May 15, 2015, on the subject fraudulent loan.

101.

Based on the April 6, 2015, letter from ALLIANZ LIFE INSURANCE COMPANY OF

NORTH AMERICA, plaintiffs contacted defendants and HADDOX told plaintiffs not to worry,

that there was some mix-up, that HADDOX had moved some of plaintiffs' monies around and

that the so-called loan was to be satisfied from the annuity itself, the ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9074.

102.

Unbeknownst to plaintiffs, on or about April 15, 2015, defendants created a NATIONAL

WESTERN LIFE INSURANCE COMPANY annuity account in plaintiffs' identity and those

accounts bore annuity [truncated] accounts #1425, #1426 and #1427.

103.

Unbeknownst to plaintiffs until recently, on April 16, 2015, ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to

HADDOX's home address at defendants' directions, with notification of an alleged request to

take a distribution from [truncated] account #9074 but never mentioned that HADDOX's license

was cancelled.

104.

Unbeknownst to plaintiffs until recently, on April 16, 2015, ALLIANZ LIFE

INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with notification of an alleged request to take a distribution from annuity [truncated] account #3526 but never mentioned that HADDOX's license was cancelled.

105.

Unbeknownst to plaintiffs until recently, on April 16, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with notification that ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a check in the sum of approximately $4,657, from annuity [truncated] account #7982.

106.

Unbeknownst to plaintiffs until recently, on April 16, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with notification that ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a check in the sum of approximately $40,000, from annuity [truncated] account #9074.

107.

Unbeknownst to plaintiffs until recently, on April 16, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with notification that ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a check in the sum of approximately $3,600, from annuity [truncated] account #3526.

108.

Unbeknownst to plaintiffs until recently, on April 17, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with a notification of an alleged request to take a distribution from [truncated] account #7982 but never mentioned that HADDOX's license was cancelled.

109.

Unbeknownst to plaintiffs until recently, on or about May 4, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9074, as alleged herein above, reflected an alleged "internal loan payoff" balance of approximately $71,994, with an account value of approximately $172,513, a cash surrender value of approximately $100,434, but also containing an indication that defendants had withdrawn approximately $30,000 in partial cash surrender from that annuity account.

110.

Unbeknownst to plaintiffs until recently, on or about May 6, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity [truncated] account #9074, as alleged herein above, was being partially surrendered and a check in the sum of approximately $73,466, and that those surrender proceeds, after commissions and fees were applied, was going

to pay off the internal, outstanding loan [fraudulent loan].

111.

Unbeknownst to plaintiffs until recently, on May 8, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with notification of an alleged request to take a distribution from [truncated] account #9074.

112.

Unbeknownst to plaintiffs until recently, on June 22, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, with an [unauthorized] distribution check of approximately $62,534, after defendants took commissions and fees and surrender charges were assessed, from annuity [truncated] account #9074.

113.

Unbeknownst to plaintiffs until recently, on or about July 31, 2015, JACKSON NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of August 1, 2014 to July 31, 2015] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions. Plaintiffs have never seen the actual statement issued by JACKSON NATIONAL LIFE INSURANCE COMPANY.

114.

Defendants took the real and mis-directed July 31, 2015, JACKSON NATIONAL LIFE INSURANCE COMPANY annual [for a period of August 1, 2014 to July 31, 2015] Statement, under [truncated] account #0992 [issued back on July, 2012], and defendants altered and created

a new version to suggest that the annuity interest earned and total value were larger than reality.

115.

Plaintiffs had no reason to know or suspect defendants' fraud.

116.

As of December 31, 2015, plaintiffs' USAA total portfolio listed a value of approximately $13.19.

117.

Unbeknownst to plaintiffs until recently, on or about December 31, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of December 31, 2015, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #7982 had a value of approximately $60,248.

118.

Unbeknownst to plaintiffs until recently, on or about December 31, 2015, ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA issued a Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of December 31, 2015, the ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA annuity account in plaintiffs' identity, under [truncated] account #3526 had a value of approximately $88,463.

119.

Unbeknownst to plaintiffs until recently, on or about March 28, 2016, JACKSON

NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of March 27, 2015 to March 28, 2016] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of March 28, 2016, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March, 2012], had a total value of approximately $128,221, and a cash surrender value of approximately $119,887.

120.

Unbeknownst to plaintiffs until recently, on or about January 21, 2017, JACKSON NATIONAL LIFE INSURANCE COMPANY wrote plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, and stated that the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March, 2012], had a fair market value of approximately $129,345, and that RMDs were due the IRS for tax purposes.  Defendants did not advise plaintiffs accordingly.

121.

Unbeknownst to plaintiffs until recently, on or about March 24, 2017, JACKSON NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of March 28, 2016 to March 24, 2017] Statement to plaintiffs, which was mis-directed to HADDOX's home address at defendants' directions, which stated that, as of March 24, 2017, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March, 2012], had a total value of approximately $123,876, and a cash surrender value of approximately $122,638.

122.

Unbeknownst to plaintiffs until recently, on or about July 28, 2017, JACKSON

NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of August 1, 2016

to July 28, 2017] Statement to plaintiffs, which was mis-directed to HADDOX's home address at

defendants' directions, which stated that, as of July 28, 2017, the JACKSON NATIONAL LIFE

INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account

#0992 [issued back on July, 2012], had a total value of approximately $104,052, with a cash

surrender value of approximately $112,000.

123.

It was not until January 26, 2018, that plaintiffs learned that defendants had committed a

large number of frauds and misdeeds in connection with plaintiffs' accounts, including false

material misrepresentations to plaintiffs and to the annuity issuers, material misrepresentations

with respect to the quality of his investment recommendations, issuing false and altered

statements, mail fraud, making fraudulent withdrawals, loans, distributions, liquidations and

other transactions without plaintiffs' authority, knowledge or benefit, charging excessive fees,

commissions and assessments to plaintiffs' accounts, repeated churning plaintiffs' investments,

misrepresentation and failure to disclose the existence of early termination fees, surrender fees,

up-front bonuses and commissions, misrepresentation and failure to disclose the adverse tax

consequences caused by liquidating the investments prior to maturity, misrepresentation and

failure to disclose the similarity of each product purchased and sold, failure to provide 1099s to

the plaintiffs, failure to advise plaintiffs of the cancellation of HADDOX's license,

misrepresenting to plaintiffs of the reason for HADDOX's agency termination with annuity

issuers, and taking actions to conceal the frauds and misleading plaintiffs.

124.

Plaintiffs had their real address placed in all annuity issuers' records so that plaintiffs would begin receiving notices and communications.

125.

Plaintiffs began gathering historical account and communications records from the annuity issuers which those issuers re-printed and sent to plaintiffs' read address.

126.

Unbeknownst to plaintiffs until recently, on or about March 23, 2018, JACKSON NATIONAL LIFE INSURANCE COMPANY issued an annual [for a period of March 23, 2017 to March 24, 2018] Statement to plaintiffs which stated that, as of March 24, 2017, the JACKSON NATIONAL LIFE INSURANCE COMPANY annuity account in plaintiffs' identity, under [truncated] account #8963 [issued back on March, 2012], had a total value of approximately $117,838, and a cash surrender value of approximately $124,000.

127.

Defendants engaged in the illegal practice of churning plaintiffs' investments.

128.

Churning occurred by defendants' repeated buying and selling [surrendering and taking distributions and liquidating] plaintiffs' investments [annuities] for the purpose of taking commissions, taking bonuses, charging transactional fees and assessments and causing losses due to surrender and distribution charges.

129.

Churning is also defined as a manipulative, deceptive, or other fraudulent device or contrivance, which is illegal under the Securities Exchange Act of 1934 and SEC Rules 15c1-7; in addition, churning is illegal as a device, scheme or artifice to defraud under Rule 10b–5. Securities Exchange Act of 1934, §§10[b], 15[c][1], 15 U.S.C.A. §§78j[b], 78o [c][1].

130.

Defendants maintain[ed] a position of public trust and plaintiffs relied heavily on their expertise regarding annuity investment management.

131.

Defendants stood in a fiduciary relationship to plaintiffs.

132.

Plaintiffs sustained a wide variety of economic and non-economic damages.

<u>C O U N T S</u>

**COUNT 1 - NEGLIGENCE**

133.

Defendants owed duties of reasonable care to plaintiffs.

134.

Defendants failed to exercise reasonable care and prudence in the advice, consultation and management of plaintiffs' financial affairs and investments, all made the subject of this lawsuit, and which consequently caused damaged plaintiffs.

## COUNT 2 - BREACH OF TRUST AND FIDUCIARY DUTIES

135.

Defendants owed fiduciary duties and duties of due diligence to Plaintiffs.

136.

Defendants breach their fiduciary duties and duties of due diligence to plaintiffs, in the following illustrative, non-exclusive premises: [a] failure to make true and accurate statements of material facts to their clients/plaintiffs; [b] conspiring to defraud clients/plaintiffs; [c] failing to act upon the requests of their clients/plaintiffs to sell stocks; [d] failing to act in their clients'/plaintiffs' best interests; [e] failure to disclose material facts to clients/plaintiffs; [f] failure to act in good faith towards their clients/plaintiffs; [g] false material misrepresentations to plaintiffs and to the annuity issuers; [h] material misrepresentations with respect to the quality of his investment recommendations; [i] issuing false and altered statements; [j] mail fraud; [k] making fraudulent withdrawals, loans, distributions, liquidations and other transactions without plaintiffs' authority, knowledge or benefit; [l] charging excessive fees, commissions and assessments to plaintiffs' accounts; [m] repeated churning plaintiffs' investments; [n] misrepresentation and failure to disclose the existence of early termination fees, surrender fees, up-front bonuses and commissions; [o] misrepresentation and failure to disclose the adverse tax consequences caused by liquidating the investments prior to maturity; [p] misrepresentation and failure to disclose the similarity of each product purchased and sold; [q] failure to provide 1099s to the plaintiffs; [r] failure to advise plaintiffs of the cancellation of HADDOX's license; [s] misrepresenting to plaintiffs of the reason for HADDOX's agency termination with annuity issuers; [t] taking actions to conceal the frauds and misleading plaintiffs; and [u] violating state

and federal securities laws and SEC Rules 15c1-7.

## COUNT 3 - DECEPTION/DECEPTIVE TRADE PRACTICES

137.

Defendants purposefully deceived Plaintiffs to gain an economic advantage and engaged in unfair, deceptive and illegal acts and omissions designed to gain economic benefit from the deception.

138.

Defendants have violated Texas's deceptive trade practices laws by engaging in unfair and deceptive trade practices aimed at harming plaintiffs.   Defendants are liable unto plaintiffs accordingly.

## COUNT 4 - LOUISIANA BLUE SKY LAWS

139.

Louisiana Blue Sky Laws define unlawful conduct violating the state's securities laws in La. RS 51:712, in pertinent part:

"A. It shall be unlawful for any person:

[1] To offer to sell or to sell any security in violation of R.S. 51:703, 705, or any rule, regulation or order promulgated or issued by the commissioner under this Part.

[2] To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

[3] To offer or sell any security:

[a] Registered under R.S. 51:705[B] by means of any prospectus except a prospectus which complies with R.S. 51:705[B][3].

[b] Registered under R.S. 51:705[E] by means of any prospectus except a prospectus which complies with R.S. 51:705[E][3].

© Registered under R.S. 51:705[F] by means of any prospectus except a prospectus which complies with R.S. 51:705[F][4].

B. It shall be unlawful for any person to make to any prospective purchaser, customer, or client any representation that the filing or effectiveness of a registration statement or the registration of any security under R.S. 51:705, or the existence of any exemption for any security or transaction means that the commissioner has passed in any way upon the truth, completeness, or accuracy of such registration statement or the merits of such security or has recommended or given approval to such security or transaction.

C. It shall be unlawful for any person who:

[1] Is a dealer, salesman, or investment adviser under this Part.

[2] Is making an application for registration as a dealer, salesman or investment adviser under this Part.

[3] Is an issuer which has filed a registration statement with respect to securities it intends to issue.

[4] Is an affiliate of any of the persons described in Paragraph [1], [2], or [3] of this Subsection knowingly to cause to be made, in any document filed with the commissioner or in any proceeding under this Part, any statement which is, at the time it is made and in light of the

circumstances under which it is made, false or misleading in any material respect.

D. It shall be unlawful for any person in connection with the offer, sale, or purchase of any security, directly or indirectly:

[1] To employ any device, scheme, or artifice to defraud.

[2] To engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller. ***" La. Stat. Ann. § 51:712

140.

Each of defendants' acts and omissions described herein above violate Section 712.

141.

La.. RS 51:714 is the enabling provision allowing a private right of action in a civil proceeding.

142.

La. RS 51:704 addresses the licensing requirements and effects of HADDOX's loss of that license yet defendants continued to allow HADDOX to buy and sell and liquidate securities, all such described acts and omissions in violation of Louisiana Blue Sky laws. La. RS 51:701, et.seq.

## COUNT 5 - MISREPRESENTATION

143.

Defendants purposefully or, alternatively, negligently misrepresented material facts to plaintiffs regarding investment securities and investments upon which Plaintiffs relied to their detriment.

## COUNT 6 - FRAUD

### 144.

Defendants acted in concert and conspiracy to defraud plaintiffs of investment monies.

## COUNT 7 - UNJUST ENRICHMENT

### 145.

Defendants have been unjustly enriched at the impoverishment of plaintiffs, without cause, and defendants owe the value of that enrichment which must be restituted.

## COUNT 8 - BREACH OF CONTRACT

### 146.

Defendants have breached their agreements and contracts with plaintiffs.  Defendants breaches are in bad faith, or alternatively, in good faith.  Plaintiffs are entitled to direct and indirect damages flowing therefrom.

## COUNT 9 - CIVIL CONSPIRACY TO DAMAGE PLAINTIFFS

### 147.

Defendants engaged in a civil conspiracy to damage plaintiffs.  Defendants are liable for civil conspiracy as they consist of two or more persons, with an object to be accomplished, through a meeting of minds on the object or course of action, based on one or more unlawful, overt acts, and the defendants' acts have caused damages to plaintiffs.

## COUNT 10 - TEXAS SECURITIES ACT [BLUE SKY LAW]

### 148.

Defendants also violated the Texas Securities Act a/k/a Blue Sky Law.

149.

The Texas Securities Act a/k/a Blue Sky Law prohibits false statements and material omissions in the sale of securities and imposes liability upon seller who do so.

150.

Defendants offered and sold securities to plaintiffs by means of untrue statements of material fact or omissions.

151.

Each defendant had a specific or general awareness of its role in the securities violations, substantially assisted in the violations, and intended to deceive the plaintiffs or, alternatively, acted with reckless disregard for the truth regarding the representations made by Defendants.

152.

Further, in this case, Defendant LINCOLN was a person who directly or indirectly controlled Defendant HADDOX, as his director, officer, partner, employee, agent and registered representative.  Defendant LINCOLN had a duty to supervise and oversee the activities of Defendant HADDOX and failed to do so.

153.

The Texas Securities Act a/k/a Blue Sky Law imposes this liability upon a control person/entity, for violations of their subordinate, because that person/entity is in a position to prevent the violation.

154.

None of the defendants are licensed to sell securities in the State of Texas nor are they registered through the Texas Securities Board.  The failure to obtain licensure and registration is

likewise a violation of Texas Securities Act a/k/a Blue Sky Law.

## COUNT 11 - SECURITIES ACT OF 1934, 15 U.S.C. 78

155.

Defendants violated the Securities Act of 1934 by making false statements and omissions of material fact, and in the use of a manipulative scheme, device or contrivance, in connection with the sale of securities to plaintiffs.

156.

17 C.F.R §240.10b-5 provides: "Employment of manipulative and deceptive devices. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

[a] To employ any device, scheme, or artifice to defraud,

[b] To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

© To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

157.

Defendants violated "10b-5" in numerous respects as described herein above and did so with intent to defraud and with willful or reckless disregard for the interests of the plaintiffs.

158.

The securities transactions by defendants involving plaintiffs' monies, securities and

accounts were excessive in light of plaintiffs' stated investment objectives and defendants repeatedly churned plaintiffs' investment and accounts and further placed plaintiffs' invested funds into unsuitable securities vehicles.

159.

Defendants exercised extreme control over trading in plaintiffs' accounts.

160.

Defendants placed their own objectives of profiting from fees, commissions, bonuses and other assessments, over the objectives of the plaintiffs, who were defendants' clients.

161.

Each defendant had a specific or general awareness of its role in the securities violations, substantially assisted in the violations, and intended to deceive the plaintiff or, alternatively, acted with reckless disregard for the truth regarding the representations made by Defendant HADDOX.

162.

Further, in this case, Defendant LINCOLN was a person who directly or indirectly controlled Defendant HADDOX as its employee, agent and registered representative.  Defendant LINCOLN had a duty to supervise and oversee the activities of Defendant HADDOX and failed to do so.

163.

The 1934 Act imposes this liability upon a control person/entity, for violations of its subordinate, because that person/entity is in a position to prevent the violation.

## COUNT 12 - VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

### 164.

Defendant LINCOLN is vicariously liable for the fault of its employee, agent, director and representative HADDOX.  HADDOX's acts, omissions and fault occurred while in the course and scope of his employment with LINCOLN and LINCOLN authorized his acts and omissions and LINCOLN profited from the acts and omissions of HADDOX.

## ADDITIONAL ALLEGATIONS

### 165.

The above and foregoing actions, inactions and fault of defendants, as to each and every count, have proximately caused a wide variety of damages to plaintiffs.

### 166.

Defendants are liable unto plaintiffs for all actual, statutory, exemplary and punitive damages to be awarded in this case, as well as other demands and claims asserted herein including, but not limited to, out-of-pocket expenses, property damages, pain and suffering, embarrassment, inconvenience, fear of financial security, benchmark portfolio, or well-managed account, damages, lost trading costs, loss of bargain damages, lost monies caused by churning, excessive commissions, bonuses, fees and other assessments, lost economic and investment opportunity and value, lost expectancy of profit and investment return, lost value of the investments, loss of incidental time, frustration, emotional distress, mental anguish, attorneys' fees, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PLAINTIFFS, GLYNN DALE SISTRUNK and LAWANA ANN SISTRUNK, PRAY** that after all due proceedings be had there be judgment herein in favor of Plaintiffs and against Defendants, **GREGORY LAMAR HADDOX and LINCOLN NATIONAL CORPORATION D/B/A LINCOLN FINANCIAL GROUP D/B/A LINCOLN FINANCIAL ADVISORS CORPORATION**, as follows:

1]      That there be Judgment in favor of **GLYNN DALE SISTRUNK and LAWANA ANN SISTRUNK,** and against **GREGORY LAMAR HADDOX and LINCOLN NATIONAL CORPORATION D/B/A LINCOLN FINANCIAL GROUP D/B/A LINCOLN FINANCIAL ADVISORS CORPORATION**, jointly, severally and in solido to the maximum possible extent, for all reasonable damages sustained by Plaintiffs including but not limited to actual damages, statutory damages, compensatory damages, economic damages, punitive/exemplary damages, out-of-pocket expenses, property damages, pain and suffering, embarrassment, inconvenience, fear of financial security, benchmark portfolio, or well-managed account, damages, lost trading costs, loss of bargain damages, lost monies caused by churning, excessive commissions, bonuses, fees and other assessments, lost economic and investment opportunity and value, lost expectancy of profit and investment return, lost value of the investments, loss of incidental time, frustration, emotional distress, mental anguish, attorneys' fees, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

FURTHER PRAY for all such additional, general and equitable relief as may be necessary and proper in the premises.

Respectfully submitted,

**BODENHEIMER, JONES & SZWAK, LLC**

By: _____
        **DAVID A. SZWAK, LBR#21157**
        416 Travis St., Ste. 1404
        Mid South Tower
        Shreveport, Louisiana  71101
        Telephone: [318] 424-1400
        Facsimile:[318] 221-6555
**ATTORNEYS FOR PLAINTIFFS**